## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

MICHELLE CORBETT,

      Plaintiff,

v.                                                          Case No. 3:14-cv-1507-J-32JBT

RICK BESELER, in his official
capacity as Sheriff of Clay County,

      Defendant.

_____

## O R D E R

This Title VII sex discrimination and retaliation case is before the Court on Defendant Rick Beseler's Case Dispositive Motion for Summary Judgment (Doc. 26), to which Plaintiff Michelle Corbett filed a response (Doc. 38). With the Court's permission (Doc. 56), Beseler filed a reply (Doc. 57) and Corbett filed a sur-reply (Doc. 58). In addition, Beseler filed a Daubert Motion to Exclude Certain Opinion Testimony of Dr. Glenn Caddy (Doc. 27), to which Corbett responded (Doc. 52). Finally, Corbett filed a Motion in Limine to Determine the Admissibility of Portions of Defendant's Proposed Expert Testimony (Doc. 28), to which Beseler responded (Doc. 32). On September 20, 2016, the Court held a hearing on the motion for summary judgment, the record of which is incorporated herein. (Doc. 64).

## I.      BACKGROUND

In August 2003, the Clay County Sheriff's Office ("CCSO") hired Michelle Corbett as a deputy sheriff in the patrol division. She later worked for three years at

CCSO as a school resource officer, and in May 2007, she became a narcotics detective. In July 2010, Corbett filed a charge with the EEOC alleging a hostile work environment in the narcotics unit. She voluntarily transferred back to the patrol division in February 2011, where she reported to Sergeant Mike Layne and Lieutenant Kenneth Stivers.

In June 2012, Corbett filed her first lawsuit in this Court against Rick Beseler in his official capacity as Sheriff of Clay County, alleging claims of hostile work environment, gender discrimination, and retaliation.[1] Until July 2013, Corbett had never been the subject of an internal investigation, but while her first suit was pending, CCSO investigated her four times.

In July and August 2013, CCSO conducted an investigation into allegations that Corbett failed to take proper law enforcement action ("IA 2013-024"). (Doc. 26-2). After injuring her leg on the job, Corbett assumed a light duty position in communications. In that role, she received a call from a citizen named Brenna Austin, who stated that she had seen an assault on Facebook of a disabled individual. Corbett told Austin that there was nothing she could do if the victim did not personally report

---

[1] Corbett's previous case is <u>Corbett v. Beseler</u>, Case No. 3:12-cv-728-J-25-JRK. Corbett's hostile work environment claim went out on summary judgment, and her remaining claims of sex discrimination and retaliation proceeded to trial in February 2014 before the Honorable Henry Lee Adams. (Doc. 75). At trial, Judge Adams issued a directed verdict as to Corbett's remaining claims. (Doc. 119).

Through 2014, Corbett participated in various aspects of litigating her first case, such as responding to discovery requests, participating in depositions, going to trial, and appealing to the United States Court of Appeals for the Eleventh Circuit. On December 30, 2015, the Eleventh Circuit affirmed. <u>Corbett v. Beseler</u>, 635 F. App'x 809 (11th Cir. 2015).

the incident. Corbett then cleared the call. Communications personnel reopened the call after receiving several additional complaints regarding the alleged assault. After an investigation, the victim was identified, and a suspect was arrested and charged with felony battery of a disabled adult. Bureau Commander David Senters requested that internal affairs initiate an investigation regarding Corbett's handling of the call, and Internal Affairs Detective Brian Welch conducted the administrative inquiry. Welch's investigation sustained policy violations against Corbett for violation of CCSO General Order 1000.2, Code of Conduct, Performance of Duty, for failure to take appropriate action in response to a crime. (Doc. 26-2; Doc. 43-2). Sheriff Beseler was notified of the findings, and Corbett received a notice of intent to impose discipline and a pre-disciplinary hearing. (Doc. 26-23). At the hearing, Corbett complained to Beseler that his actions were retaliatory (Doc. 33-6 at 14, Beseler Dep. 52:12-14), but Beseler thought it was an inappropriate allegation, as they were "just doing [their] job." (Id. at 15, Beseler Dep. 55:10-15). As a result of the violation, Corbett received a written reprimand. (Doc. 26-24).

In July through September 2013, CCSO investigated allegations that Corbett failed to complete a domestic violence report in violation of a CCSO general order and a Florida statute ("IA 2013-025"). (Doc. 26-3). A citizen named Douglas Deierlein went to a CCSO station to file a complaint regarding an incident of domestic violence involving his daughter and her mother. After speaking with Deierlein, Corbett did not complete a domestic violence report or document their conversation because she deemed it was not domestic violence. Reserve Deputy Katie Turner observed Corbett

telling Deierlein that there was nothing she could do for him, and Turner stopped Deierlein on his way out and encouraged him to return with his daughter and fill out a report.

Stivers was informed of Deierlein's allegations and emailed Corbett to better understand the information she had received and her actions thereafter. (Doc. 26-14). Following their email exchange, in which Corbett stated that "[Deierlein] said that his daughter told him the mother and daughter pushed each other," (id. at 3), Stivers forwarded their correspondence to Captain Joseph Bucci. Colonel Craig Aldrich ordered an investigation, which was conducted by Welch. He concluded that Corbett violated CCSO General Order 1000.2; CCSO General Order 3000.6, which requires deputies to write an incident report on every case involving an allegation of domestic violence; and Fla. Stat. § 741.29, which provides that whether or not an arrest in connection with an investigation of domestic violence is made, officers must make a written police report. Beseler reviewed the investigation report and gave Corbett a notice of intent to impose discipline and a pre-disciplinary hearing. (Doc. 26-4). Thereafter, Corbett received a five-day suspension for the violations. (Doc. 33-7). Corbett disputes the findings in CCSO's report. (Doc. 38 at 24).

On October 19, 2013, Corbett filed a charge with the EEOC in connection with IA 2013-024 and IA 2013-025, alleging sex discrimination and retaliation. (Doc. 43-6).

In March 2014, Corbett requested two days of annual leave in April, which her sergeant approved.[2] However, when April arrived, Corbett had not accrued sufficient

---

[2] CCSO sergeants review the schedule to see whether there is adequate

time to cover the absence without Beseler's approval but took the leave nonetheless. When Stivers became aware of her actions, he investigated ("IA 2014-023") and sustained a violation of CCSO General Order 5120.2, which provides that an employee may only use sick pool leave after annual, sick, or compensatory leave is exhausted, and that the sheriff must approve any unpaid leave. (Doc. 26-5; Doc. 26-19). As a result of the violations, Corbett received a notice of intent to impose discipline and a pre-disciplinary hearing, and a five-day suspension. (Doc. 26-6).

The fourth investigation into Corbett's conduct ("IA 2014-024") stemmed from a call Beseler received from a citizen named Cynthia Eckert, who complained that Corbett was rude and discourteous to her and her children during the course of an investigation, telling one of them to "shut up." Aldrich assigned Welch to investigate Eckert's complaint. Welch sustained a violation of the CCSO General Order 1000.2 (Doc. 43-2), which provides that while on duty, members shall maintain control of their temper and refrain from using coarse or insolent language. As a result, Beseler issued a notice of intent to impose discipline and gave Corbett a written reprimand. (Doc. 26-26). Corbett complained to Beseler that the discipline for IA 2014-023 and IA 2014-024 was discriminatory and retaliatory. (Doc. 39-6).

On June 18, 2014, Corbett filed a charge with the EEOC in connection with IA 2014-023 and IA 2013-024, alleging sex discrimination and retaliation. (Doc. 46-8).

Corbett suffered from various injuries and ailments, including a hip injury sustained on the job, Lyme disease, and a right ankle and foot injury sustained while

---

manpower to cover the shift in question. (Doc. 33-4 at 4, Stivers Dep. 13:16-23).

off-duty, which required her to take sick leave during the relevant time period. In June 2014, CCSO Human Resources Director S. Leigh Corley notified Corbett that she had exhausted her Family Medical Leave Act ("FMLA") leave. (Doc. 33-2). Thereafter, CCSO awarded Corbett 40 more hours from the sick leave pool, bringing her total to 520 hours from the pool, the maximum permitted for the year under CCSO General Order 5120.2.[3] (Doc. 26-9; Doc. 26-19). Corbett also received an additional 196 hours of sick leave through direct donation. (Doc. 26-11). She requested an unpaid leave of absence on August 15, 2014 because her doctor had written a note dated August 11, 2014 which prohibited her from working for four weeks. (Doc. 45-8). On August 15, 2014, Corbett's request for paid leave was granted to the extent that she had 19.95 hours of leave available to her but denied as to granting additional unpaid leave because she had no more sick leave available. (Doc. 26-12). Beseler notified Corbett that, if prior to the expiration of her leave balance on August 19, 2014, her doctor cleared her for work, she could return to work. (Id.). However, without medical clearance, CCSO would terminate her employment, effective August 19. (Id.). On August 19, Beseler administratively terminated Corbett, citing her exhaustion of all medical leave, the "numerous reasonable accommodations for [her] medical issues" made by CCSO since January 2014, and that she was not fit for duty. (Doc. 26-11).

---

[3] General Order 5120.2 provides: "No more than 520 hours will be withdrawn from the pool per member(s) during any twelve month period." "Once a member has exhausted the 520 hour rule, or there is no leave available in the pool, a member may receive a direct donation of sick leave from another member." Further, "donations shall be limited to no more than an aggregate total of 160 hours from one member(s) to another." (Doc. 26-19 at 16-17).

On August 29, 2014, Corbett filed a charge of discrimination with the EEOC, alleging sex discrimination and retaliation in connection with IA 2014-023, IA 2014-024, and her administrative termination. (Doc. 13 ¶ 8). On December 18, 2014, Corbett filed this lawsuit, alleging sex discrimination and retaliation in connection with the four investigations, discipline, and termination.[4] (Doc. 1).

## II.    STANDARD OF REVIEW

Summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1314 (11th Cir. 2011); Fed. R. Civ. P. 56(a), (c). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The movant bears the burden of showing the absence of dispute as to material facts, and upon such a showing the burden shifts to the non-moving party to establish that a genuine dispute exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The evidence must be viewed in favor of the non-moving party, and all inferences drawn in her favor. Anderson, 477 U.S. 255.

---

[4] At the time Corbett filed this lawsuit, her first lawsuit was on appeal to the Eleventh Circuit.

## III.   ANALYSIS

### A.   Sex Discrimination

Corbett alleges sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Florida Civil Rights Act, §§ 760.01-.11, Fla. Stat. ("FCRA"). "Because the FCRA is modeled on Title VII, Florida courts apply Title VII case law when they interpret the FCRA." Jones v. United Space All., L.L.C., 494 F.3d 1306, 1310 (11th Cir. 2007). Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a)(1).

Because Corbett relies on circumstantial evidence of sex discrimination, the burden shifting approach of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies. To prove a prima facie case of disparate treatment, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) she was qualified to do the job; and (4) her employer treated similarly situated male employees more favorably. See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). "If the plaintiff satisfies the four elements of a prima facie case . . . , and the employer proffers a legitimate, non-discriminatory reason for its employment action, the plaintiff must then show that the reason is a 'pretext for unlawful discrimination.'" Blue v. Dunn Const. Co., 453 F. App'x 881, 883-84 (11th Cir. 2011) (quoting Burke–Fowler v. Orange Cnty., 447 F.3d 1319, 1323 (11th Cir. 2006)).

Here, there is no dispute that Corbett is a member of a protected class or regarding her qualifications.[5] (Doc. 26 at 13). Further, Beseler concedes that Corbett experienced adverse employment actions due to her two five-day suspensions without pay and termination. (Id.). But Beseler disputes that Corbett suffered adverse employment actions as a result of four internal affairs investigations and two written reprimands and that similarly situated male employees were treated more favorably.

## 1.   **Adverse Employment Actions**

In the Eleventh Circuit, an "adverse employment action" includes "termination, failure to hire, or demotion." Blue, 453 F. App'x at 884 (citing Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008)). "An employer's conduct falling short of those actions 'must, in some substantial way, alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee.'" Id. Regarding the level of substantiality required, the plaintiff must demonstrate that she "suffered a serious and material change in the terms, conditions, or privileges of employment." Crawford, 529 F.3d at 970-71 (emphasis in original). "[T]he employee's subjective view of the significance of the employer's action is not controlling; rather, the employment action must be materially adverse to a reasonable person under the circumstances." MacLean v. City of St. Petersburg, 194 F. Supp. 2d 1290, 1298 (M.D. Fla. 2002) (citing Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001)). "Title VII[ ] is neither 'a

---

[5] For the limited purpose of analyzing her prima facie case, Beseler acknowledges that Corbett was qualified for her position until the time of her termination. (Doc. 26 at 13).

general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir. 1999)).

Corbett argues that the four internal affairs investigations and two written reprimands constitute adverse employment actions. (Doc. 38 at 20-21). However, she does not argue or provide evidence that these actions resulted in a "serious and material change in the terms, conditions, or privileges of her employment." While she concedes that it is "generally true" that such actions are not adverse, she contends that "the first written reprimand was cited in [her] July 2014 suspension and following her second written reprimand, she was told that any further discipline would result in termination." (Id. at 21). In support of this statement, she cites cases which stand for the proposition that an internal investigation may constitute an adverse employment action where it ultimately leads to the plaintiff's termination. See Kubiak v. S.W. Cowboy, Inc., No. 3:12-cv-1306-J-34JRK, 2016 U.S. Dist. LEXIS 19701, at *72 (M.D. Fla. Feb. 18, 2016) ("[I]t is undisputed that [the defendants'] investigation of the double bump ultimately led to [the plaintiff's] termination."); Hughes v. City of Lake City, No. 3:12-cv-158-J-32JBT, 2014 U.S. Dist. LEXIS 42103, at *18 (M.D. Fla. Mar. 28, 2014) ("[T]he IA ultimately led to [plaintiff's] termination, and would have dissuaded a reasonable worker from bringing a charge of discrimination."); Mullins v. City of N.Y., 626 F.3d 47, 54 (2d Cir. 2010) (internal investigation was adverse employment action because it carried possibility of termination, postponed one officer's

retirement, and was noted in personnel file, which affected employees' level of discipline for future infractions).

While Corbett states that she was told that future discipline would result in termination, unlike all of the cases cited above, there is no evidence that the investigations or the written reprimands at issue ultimately led to Corbett's termination. To the contrary, the evidence shows that Beseler terminated Corbett on entirely different grounds: the exhaustion of all FMLA and other sick leave available to her (Doc. 26-11) in conjunction with the CCSO's policy of "never" granting an employee an unpaid leave of absence (Doc. 33-6 at 6, Beseler Dep. 18:14-19). None of the evidence submitted in connection with Corbett's termination even alludes to the internal investigations or written reprimands, much less shows that they led to her termination. Therefore, because the internal investigations and written reprimands did not materially affect Corbett's employment or lead to her termination, they are not adverse employment actions.

Nevertheless, the parties agree that the two five-day suspensions and termination satisfy this element of her prima facie case.

## 2.   <u>Similarly Situated Employees</u>[6]

The fourth element of Corbett's prima facie case is proof that her employer treated similarly situated employees outside her classification more favorably.

---

[6] Because the Court has found that the four investigations and two written reprimands do not constitute adverse employment actions, <u>see</u> <u>supra</u> Part III.A.1, it need not analyze whether Corbett has provided proper comparators for those incidents. Instead, the Court limits its analysis to comparators provided in connection with the two five-day suspensions and administrative termination.

Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). To meet this element, the plaintiff and her comparator must be engaged in nearly identical conduct and have been disciplined in different ways. See Hughes, 2014 U.S. Dist. LEXIS 42103, at *5 (citing McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008)). "Both the quality and the quantity of misconduct must be nearly identical for the other individual to provide an adequate comparison." Id. "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." Holifield, 115 F.3d at 1562.

First, Corbett received a five-day suspension in connection with IA 2013-025, which found that she violated CCSO general orders and a Florida statute for failing to complete a domestic violence report. It appears as though Corbett does not offer any comparators for her conduct and discipline in connection with this investigation.[7] However, Beseler identifies two possible comparators in his motion for summary judgment that Corbett mentioned during her deposition; thus, the Court will address these individuals for the sake of thoroughness.

---

In addition, Corbett has provided an exhibit titled "IA Log," which is a composite of IA logs for 2012, 2010, 2007, 2003, 1999, and 1989, and which contains several highlighted names. (Doc. 40-16). To the extent Corbett has highlighted a name on this exhibit, unless she also named that individual as a comparator in her response in opposition to summary judgment (Doc. 38), the Court will not consider it, as it is unclear for what purpose those names are highlighted.

[7] It is unclear whether Corbett suggests that Reserve Deputy Katie Turner is a proper comparator. (See Doc. 38 at 9) ("Turner, who as a reserve deputy was certified as a law enforcement officer but who had never complained about discrimination, prepared no domestic violence report after her alleged conversations with Deierlein. Corbett was the only person subjected to an IA investigation and disciplined."). To the extent Corbett argues as much, the Court finds that Turner is not a proper comparator, for she is a female and therefore not outside the protected class.

When asked at her deposition whether she could think of anyone else who she believed was treated differently, Corbett identified the "undersheriff," who was "accused of . . . failure to take law enforcement action when someone complained about something, and he didn't—he got a verbal by the sheriff." (Doc. 33-1 at 16, Corbett Dep. 60:21-61:24). In his motion for summary judgment, Beseler identifies the "undersheriff" as Aldrich (Doc. 26 at 15) and submits the Affidavit of Michael Brian Welch, which states that Aldrich has "never been the subject of an internal affairs violation by CCSO." (Doc. 26-29 ¶ 7). Therefore, as Aldrich had never been the subject of an internal affairs violation, as Corbett had been at the time this incident occurred, he is not a proper comparator because their disciplinary histories are not comparable. Moreover, Corbett has failed to provide sufficient evidence for the Court to ascertain whether the conduct Corbett described at her deposition is even comparable—"failure to take law enforcement action when someone complained about something" is too vague to meet the Eleventh Circuit's requirement "that the quantity and quality of the comparator's misconduct be <u>nearly identical</u> to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." <u>Maniccia</u>, 171 F.3d at 1368 (emphasis added).

Regardless, it seems as though Corbett may have confused Aldrich with Staff Inspector Gayward Hendry.[8] Beseler provides evidence that since he took office in January 2005, Corbett is the only CCSO employee who has been investigated and

---

[8] Beseler states in the motion for summary judgment, "To the extent Corbett is actually referring to Staff Inspector Gayward Hendry . . . ." (Doc. 26 at 15).

sustained for failing to complete a report regarding an allegation of domestic violence in violation of CCSO general orders and Fla. Stat. § 741.29. (Doc. 26-29 ¶ 6). Moreover, even if Hendry's conduct—whatever it may have been—was similar enough for comparison, he had not been found to have violated any CCSO policies at the time of the alleged policy violation Corbett mentioned in her deposition. See Hudson v. Norfolk S. Ry. Co., 209 F. Supp. 2d 1301, 1332 (N.D. Ga. 2001) ("Plaintiff's claim still would fail because she has not alleged that [the purported comparator] had any prior disciplinary history similar to her record of warnings for dishonesty. Therefore, this purported comparator employee is not 'similarly situated.'") (citing Maniccia, 171 F.3d at 1369 (employee who was fired after four policy violations cannot compare her treatment to that of former co-workers who each committed only one violation)). When Corbett was disciplined in this matter, she already had two IAs sustained against her: IA 2013-024 and IA 2013-025. For these reasons and those noted above regarding Aldrich, Hendry is not a proper comparator.

Next, Beseler suspended Corbett for five days in connection with IA 2014-023, the investigation concerning Corbett's violation of a CCSO general order by taking two days of annual leave despite not having accrued sufficient time to cover her absence. Similar to IA 2013-025, it appears as though Corbett does not offer any comparators for her conduct and discipline in connection with this investigation.[9]

---

[9] In a section of her response apparently dedicated to arguments regarding inadmissibility and pretext, Corbett argues that "in the instance of Corbett's five-day suspension for taking unpaid leave, a material question of fact is created by her sergeant and lieutenant's each having approved the request, but not having been disciplined for doing so." (Doc. 38 at 24). The Court does not believe these two

Finally, the record reflects that Beseler administratively terminated Corbett after she exhausted all of her available leave. Corbett offers three comparator employees who she alleges were treated differently than she: (1) Lieutenant Clay Chandler, who was on leave for over a year before taking disability retirement in December 2008 (Doc. 38 at 15, 23; Doc. 47-14); (2) Deputy Sheriff Fred Eckert, who was on leave from July 2011 until he died in September 2012 (Doc. 38 at 23; Doc. 48-1); and (3) Detention Deputy Charlie Williams, who exhausted his FMLA time in April 2014 and used sick leave pool hours and directly donated leave hours until he resigned in December 2014, when his doctor prohibited him from working indefinitely (Doc. 38 at 23; Doc. 48-2).

On June 27, 2014, Captain James Morgan notified Corbett that she had received a total of 520 hours of sick leave pool hours, which is the maximum allowed per policy during any 12-month period pursuant to the CCSO General Order 5120.2. (Doc. 26-9; Doc. 26-19 at 16). Therefore, Corbett was ineligible for additional hours from the sick leave pool until January 2015 and had to rely on donated leave if she was to take any additional time off work. After Morgan requested donated leave from Corbett's colleagues on her behalf on July 8, 2014 (Doc. 26-10), she received 196 donated hours. (Doc. 26-11). Corbett admits that she received all of the leave that her coworkers were willing to donate. (Doc. 33-1 at 40, Corbett Dep. 154:3-7). Therefore,

---

individuals are necessarily meant to be included as comparators in connection with IA 2014-023, but to the extent they are, they are not proper comparators because their conduct was not "nearly identical" to Corbett's conduct. The evidence does not show that the sergeant or the lieutenant requested leave without having accrued sufficient time to cover the absence, and therefore, they are not proper comparators.

when she requested an unpaid leave of absence from Beseler, she had no more available leave.

Corbett acknowledges that each of the three comparators differs from her in a key way: they had not exhausted their sick pool and/or direct donation leave prior to their separation from CCSO. (Doc. 38 at 23-24). Importantly, the evidence shows another crucial difference: none of these comparators requested an unpaid leave of absence once they exhausted their benefits. (Doc. 38 at 23). Indeed, Chandler stayed on the payroll through his last day because he had sufficient donated leave after exhausting all of his sick pool leave. (Doc. 47-14 at 4; Doc. 33-6 at 8, Beseler Dep. 29:3-14). Eckert passed away before exhausting his directly donated leave. (Doc. 48-1). Williams used sick and donated leave until he resigned. (Doc. 48-2). Corbett argues, however, that they were still similar to her in all "***relevant*** aspects: the donated leave actually cost CCSO and the taxpayers money . . . while the unpaid leave that Corbett sought, but was denied, would have cost CCSO nothing—other than a perfect opportunity to get rid of [a] complaining woman whom Beseler no longer wanted around." (Doc. 38 at 24) (emphasis in original).

However, these comparators were not similar to Corbett in all relevant aspects. In fact, the evidence shows that they differ from her in arguably the most relevant aspects: they had donated leave available and did not request an unpaid leave of absence. As such, they are not similarly situated to Corbett. In sum, for each of the adverse employment actions, Corbett has failed to meet her burden of identifying male comparators who engaged in nearly identical conduct but were treated more favorably.

Because the Court finds that Corbett has not set forth any similarly situated comparators, her prima facie case fails.

### 3.   Circumstantial Evidence of Discrimination

Even if a plaintiff's case fails under the McDonnell Douglas framework, she will still survive summary judgment if she provides "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith v. Lockheed–Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (citations omitted); Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1255 (11th Cir. 2012) ("The McDonnell Douglas framework is not, however, the only way to use circumstantial evidence to survive a motion for summary judgment, and a 'plaintiff's failure to produce a comparator does not necessarily doom [her] case.'"). The fundamental question then remains whether the plaintiff has presented circumstantial evidence sufficient to raise a reasonable inference of intentional discrimination. Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012); Holifield, 115 F.3d at 1564. Such evidence must be "comparably powerful" to evidence that the plaintiff was treated less favorably than a similarly situated offender. Bell v. Crowne Mgmt., LLC, 844 F. Supp. 2d 1222, 1234 (S.D. Ala. 2012); see Holland v. Gee, 677 F.3d 1047, 1063 (11th Cir. 2012) (convincing mosaic found where the fired employee was treated differently after she informed her employer of her pregnancy, her employer even admitted that the employee was treated differently because of her pregnancy, and the credibility of the ultimate decision-maker was heavily challenged at trial even far beyond the evidence rebutting his proffered reasons for firing the employee).

Here, to the extent Corbett argues that she need not produce a comparator because she has set forth a convincing mosaic of circumstantial evidence to survive summary judgment, her argument fails.[10] She has not presented a "convincing mosaic" of evidence suggesting that her discipline or termination was motivated by her gender because "any evidence of gender-motivated animus is entirely lacking in this case." Clark v. S. Broward Hosp. Dist., 601 F. App'x 886, 896 (11th Cir. 2015).

Corbett has failed to point to any comments or actions taken by Beseler which indicate that her sex motivated the suspensions or termination. She testified that there have been no direct comments to her that are about her gender or that would indicate a retaliatory motive. (Doc. 33-1 at 38, Corbett Dep. 148:7-20). In addition, she stated that she had no "independent recollection" of people calling her names or making gender-related comments since she transferred back to patrol in 2011. (Id.). While Corbett raises the point that "before she started to complain about discrimination, [she] had not suffered such adverse actions, nor [been] investigated for any alleged misconduct," she provides no evidence beyond her insufficient comparator evidence and conclusory allegations that sex discrimination motivated Beseler. (Doc.

---

[10] It is unclear whether Corbett is even making this argument. In her "Applicable Legal Standard" section under "For establishing gender discrimination," Corbett cites Chapter 7 Trustee for the proposition that she need not identify a comparator if she can point to sufficient non-comparator evidence to create a triable issue of fact. See Chapter 7 Tr., 683 F.3d at 1255; (Doc. 38 at 17). Thereafter, however, she does not raise the argument. Instead, it appears that her arguments for proving sex discrimination are limited to demonstrating comparators, evidenced by "Point 3: Plaintiff suffered gender discrimination during her tenure with defendant, as indicated by the way she was treated vs. the way the males were treated." (Id. at 23). She points to no other circumstantial evidence to show sex discrimination.

18

38 at 20). As such, the Court finds no convincing mosaic of circumstantial evidence such that Corbett's sex discrimination claim can survive summary judgment. Summary judgment is therefore appropriate as to Count I (sex discrimination in violation of Title VII) and Count II (sex discrimination in violation of FCRA).

### B.   Retaliation

Title VII prohibits employers from retaliating against an employee because she has opposed acts made unlawful by Title VII. See 42 U.S.C. § 2000e–3(a). Absent direct evidence that an employer has so acted, courts in the Eleventh Circuit employ the McDonnell Douglas burden-shifting framework when analyzing claims for retaliation. See Clark, 601 F. App'x 886 at 896. A plaintiff must first make a prima facie case by showing: (1) that she engaged in statutorily protected activity; (2) that she suffered a materially adverse action; and (3) that the protected activity caused the adverse action. Id. (citing Chapter 7, 683 F.3d at 1258). The burden of production then shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment action, which the plaintiff can rebut with evidence of pretext. Id.

During the time in which her first lawsuit and appeal against Beseler were pending, the CCSO conducted internal investigations and disciplined Corbett, sometimes in close temporal proximity with her alleged protected activity. Given these circumstances, it is worth scrutinizing whether Beseler took these actions in retaliation against Corbett for filing her first lawsuit and later EEOC charges. Although it is unclear whether all of the actions Corbett alleges she took constitute statutorily protected activity and whether she has sufficiently established a causal connection between her protected activity and the adverse employment actions she

suffered, the Court assumes <u>arguendo</u> that Corbett has established a <u>prima facie</u> case of retaliation.[11]

### 1.    Legitimate, Non–Retaliatory Reasons

Once the plaintiff establishes a <u>prima facie</u> case, the defendant must articulate a legitimate, non-retaliatory reason for the adverse employment action. <u>Woods v. Delta Air Lines Inc.</u>, 595 F. App'x 874, 877 (11th Cir. 2014). This burden is "exceedingly light" in comparison to the burden required if the plaintiff has presented direct evidence of discrimination. <u>Smith v. Horner</u>, 839 F.2d 1530, 1537 (11th Cir. 1988). If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to create a triable issue, must produce evidence that the proffered reason is merely a pretext for discrimination. <u>Perryman v. Johnson Prods. Co.</u>, 698 F.2d 1138, 1142 (11th Cir. 1983).

Beseler imposed the two five-day suspensions because Corbett's actions violated CCSO policies and, in IA 2013-25, a Florida statute. (Doc. 26 at 24). He conducted no further investigation and based his review on the contents of the internal investigation reports. (Doc. 33-6 at 13, Beseler Dep. 47:5-21). Beseler states that CCSO has "every right to enforce its lawful policies and hold Corbett accountable to meet the requirements of her position, which directly impact the safety and welfare of the

---

[11] The Court's analysis of the adverse employment actions in connection with Corbett's sex discrimination claim also applies to her retaliation claim. <u>See</u> <u>supra</u> Part III.A.1. Therefore, the two five-day suspensions and termination constitute the adverse employment actions at issue in analyzing Beseler's legitimate, non-retaliatory reasons for disciplining and terminating Corbett and her arguments regarding pretext.

citizens of Clay County." (Doc. 26 at 24). In addition, Beseler states that he terminated Corbett after she exhausted all FMLA, sick pool, and donated leave available to her. While Beseler has the authority to grant an unpaid leave of absence, he testified that "we never do that" and "we've never made a practice of it." (Doc. 33-6 at 4-6, Beseler Dep. 12:6-8, 18:14-19). Further, Aldrich testified that he is unaware of anyone in the CCSO ever receiving leave without pay. (Doc. 33-5 at 4, Aldrich Dep. 10:2-5). In fact, Beseler identified at least one male employee, Max Van Fossen, who requested and was denied an unpaid leave of absence.[12]  (Doc. 26-30 at 2; Doc. 33-3).

Beseler has presented sufficient evidence of legitimate, non-retaliatory reasons for Corbett's two five-day suspensions and her termination as a result of Corbett's exhaustion of all leave available to her. In light of this finding, Corbett must demonstrate that the employer's reasons are a "pretext for prohibited retaliatory conduct." <u>Johnson v. Booker T. Washington Broad. Serv., Inc.</u>, 234 F.3d 501, 507 n.6 (11th Cir. 2000).

### 2.    <u>Pretext</u>

To show pretext, the plaintiff must present sufficient evidence "to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." <u>Gerard v. Bd. of Regents of State of Ga.</u>, 324 F. App'x 818, 826 (11th Cir. 2009) (quoting <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir. 1997)). Further, "conclusory allegations, without more,

---

[12] At oral argument, Corbett conceded that she had no evidence that Beseler had ever approved unpaid leave for anyone.

are insufficient to show pretext." Id. (citing Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376-77 (11th Cir. 1996)). "Instead, the plaintiff must meet the proffered reason 'head on and rebut it.'" Id. (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)). A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993). The Court must "not act as a super-personnel department that reexamines an entity's business decisions; rather we limit our inquiry to whether the employer gave an honest explanation of its behavior." Thomas v. CVS/Pharmacy, 336 F. App'x 913, 914 (11th Cir. 2009) (internal quotations and citations omitted).

Corbett provides a number of reasons for why Beseler's explanations are mere pretext for retaliation. First, she disputes that she violated the CCSO's policies and denies wrongdoing on her part. (Doc. 38 at 24). However, in the Eleventh Circuit, the question is not whether the plaintiff actually engaged in the alleged misconduct; rather, it is whether the employer in good faith believed the reports of misconduct. See Clark, 601 F. App'x at 896 (citing Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266-67 (11th Cir. 2010) (the "question is whether her employers were dissatisfied with her for [ ] non-discriminatory reasons, even if mistakenly or unfairly so"); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (inquiry is limited to whether employer believed plaintiff was guilty of misconduct and if so, whether that was reason behind discharge; that employee did not actually engage in misconduct is irrelevant)). Corbett has failed to identify any reason to suspect that Beseler did not

honestly believe the truth of the allegations against Corbett or the findings of the internal investigation reports.

Next, Corbett argues that Beseler has failed to introduce admissible evidence of its reasons for disciplining her because the internal investigation reports contain hearsay. (Doc. 38 at 24; Doc. 58 at 2). However, because the reports and statements contained therein are not offered for the truth of the matter asserted, but as evidence of Beseler's legitimate, non-retaliatory basis for disciplining Corbett (Doc. 57 at 6), they are not hearsay. See Fed. R. Evid. 801(c). Even if the IA reports contained hearsay which could not be reduced to admissible evidence, Corbett herself has introduced evidence demonstrating Beseler's legitimate, non-retaliatory basis for disciplining her through the four notices of intent to impose discipline Beseler sent to her. (Docs. 40-14, 40-15, 45-3, and 45-4).

Third, Corbett asserts that regarding IA 2014-023, "a material question of fact is created by her sergeant and lieutenant's each having approved the [leave] request, but not having been disciplined for doing so, overlaid on CCSO's failure to pay her for that time."[13] (Doc. 38 at 24). She provides no further support for this argument. Regardless, the evidence shows that sergeants merely review leave requests to see whether there is adequate manpower to cover a requested absence, not whether the employee has adequate time to take the leave. (Doc. 33-6 at 18, Beseler Dep. 67:3-23; Doc. 33-4 at 4, Stivers Dep. 13:12-25). In addition, Corbett testified that she did not

---

[13] Although Corbett states that Lieutenant Stivers approved her time (Doc. 33-1 at 18-19, Corbett Dep. 71:10-72:12), he denies doing so (Doc. 33-4 at 5, Stivers Dep. 14:1-3).

expect to be paid for the time off in April because she knew she would not have accrued sufficient vacation days by then. (Doc. 33-1 at 20, Corbett Dep. 74:14-17). She also testified that Sergeant Layne told her she would not be paid for the time she was absent and that she said, "Yes, I understand that. I don't expect to be."[14] (Doc. 33-1 at 19, Corbett Dep. 72:19-23). In light of Corbett's failure to identify a policy violation committed by the sergeant or lieutenant that might result in discipline and her own testimony that she did not expect to be paid for the time off in April, no material question of fact exists on this point.

Fourth, Corbett asks a rhetorical question in support of her pretext argument regarding her termination: "[I]f a male deputy such as Fred Eckert could remain off duty for more than a year, accruing benefits and pension contributions as he died, why could not Corbett [sic] stay on the payroll *for free* while she healed?" (Doc. 38 at 24-25) (emphasis in original).[15] Similarly, when asked at her deposition why she believed Beseler did not have a legitimate right to separate her employment when she had exhausted her leave, she merely said, "[Beseler] could have given me the leave without

---

[14] Given her testimony on this point, it is unclear why Corbett now argues that Beseler should have paid her for the time off in April.

[15] At oral argument, Corbett underscored the illogical nature of a policy which allows an employee to stay out on donated leave and accrue benefits but refuses to allow an employee to stay out on unpaid leave and not receive benefits. (See also Doc. 38 at 24). However, this argument yet again represents an instance of Corbett quarreling with the wisdom of Beseler's leave policies, not a legally sufficient rebuttal of Beseler's proffered reason for terminating her. As such, to the extent it is the Court's duty to evaluate whether Corbett has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence," the Court finds she has failed to do so. Combs, 106 F.3d at 1538.

pay . . . there was really no reason for him not to." (Doc. 33-1 at 28, Corbett Dep. 107:9-19). The Eleventh Circuit has made it clear that to show pretext, the plaintiff must "meet [the proffered] reason head on and rebut it, and . . . cannot succeed by simply quarreling with the wisdom of that reason." Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) (citations omitted). Corbett's argument is a quintessential example of a plaintiff quarreling with the wisdom of an employer's reason: Beseler's policy against allowing an unpaid leave of absence. As explained, supra Part III.A.2, Eckert had donated leave which allowed him to remain off duty while obtaining benefits; Corbett had donated leave, too, and took advantage of it, but unlike Eckert, her donated leave ran out. In addition, Beseler has provided evidence that CCSO does not grant unpaid leaves of absence to men or women once an employee has exhausted all forms of medical leave. (See Doc. 26-30 at 2). Here, Corbett has merely expressed her disagreement with Beseler's decision not to exercise his discretion and grant her an unpaid leave of absence, and accordingly, she has not shown that Beseler's reason was false and that his true motive for terminating her was retaliation.

Finally, Corbett reiterates that she had never suffered any discipline or adverse treatment by CCSO until she started complaining about sex discrimination in the narcotics unit. (Doc. 38 at 21). However, to the extent Corbett bases her pretext argument on the temporal proximity between her protected activity and the suspensions and termination, the Eleventh Circuit has found that "summary judgment is proper where the defendant offers legitimate reasons and the employee

only offers temporal proximity." <u>See</u> <u>Wascura v. City of S. Miami</u>, 257 F.3d 1238, 1244-45, 1247 (11th Cir. 2001) ("While a close temporal proximity between two events may support a finding of a causal connection between those two events, . . . the three and one-half month period between Wascura's notification to the Commissioners of her son's illness and her subsequent termination does not, standing alone, show that the City's articulated reasons for her termination were pretextual.").[16] Here, as explained above, Corbett has offered no evidence sufficient to rebut Beseler's legitimate, non-retaliatory reasons for disciplining and terminating her, and any temporal proximity alone would not defeat summary judgment. <u>See</u> <u>Jackson</u>, 190 F. App'x at 768 ("although temporal proximity existed between [plaintiff's] complaint and her termination, [plaintiff] could not show [defendant's] firing [plaintiff] for violation of its policy . . . was pretextual").[17] Summary judgment is therefore appropriate as to Count III (Title VII Retaliation) and Count IV (FCRA Retaliation).

Accordingly, it is hereby

**ORDERED:**

---

[16] In establishing a <u>prima facie</u> case of retaliation, "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." <u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361, 1364 (11th Cir. 2007). Thus, temporal proximity alone can be sufficient to satisfy the causation element of a <u>prima facie</u> case. (Here, the Court assumed <u>arguendo</u> that Corbett established a <u>prima facie</u> case.) However, temporal proximity itself is not enough to establish pretext: "Although a plaintiff can use temporal proximity to show a defendant's proffered reason for termination was pretextual, temporal proximity alone does not establish pretext." <u>Jackson v. Hennessy Auto</u>, 190 F. App'x 765, 768 (11th Cir. 2006).

[17] Also cutting against Corbett's reliance on temporal proximity regarding her termination is that her termination was based upon her exhausting her leave and had nothing to do with the disciplinary issues.

1.      Defendant Rick Beseler's Case Dispositive Motion for Summary Judgment (Doc. 26) is **GRANTED**.

2.      Defendant Rick Beseler's <u>Daubert</u> Motion to Exclude Certain Opinion Testimony of Dr. Glenn Caddy (Doc. 27) is **MOOT**.

3.      Plaintiff Michelle Corbett's Motion in Limine to Determine the Admissibility of Portions of Defendant's Proposed Expert Testimony (Doc. 28) is **MOOT**.

4.      The Clerk shall enter judgment in favor of Defendant Rick Beseler and against Plaintiff Michelle Corbett, terminate all pending motions and deadlines, and close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 22nd day of September, 2016.

TIMOTHY J. CORRIGAN
United States District Judge

sj
Copies:

Counsel of record

27